The one case we have for argument is Access Reinsurance Company v. Northrop. And, counsel, are you ready? Ready. Okay, Mr. Fong, I believe. Yes, good morning. Kevin Fong, representing appellant Northrop Grumman. I'd like to reserve three minutes for rebuttal. May it please the court. I'll try and alert you. Thank you. This is an improper erosion case brought by an excess carrier. The plaintiff is Access Reinsurance, a second-level excess carrier, and the defendant is Northrop, the insurer. Access is attempting to avoid coverage on one claim against Northrop by asserting that Northrop's underlying insurers improperly eroded their policy limits by settling an earlier different claim against Northrop. That improper erosion theory is wrong. Let me begin with the Costco case. Mr. Fong, this is Judge Callahan. I have a question. I think we know we asked you to talk about Costco, but the district judge seemed to grant summary judgment on, like, two grounds. It was the improper erosion, which I don't know if that's really even a legal theory, because when you Google, when you try to do legal research, you get all sorts of things about houses falling off hills. But then the second one is the disgorgement, but it seems that the judge, the district judge, went to the disgorgement first. Can you even get to the disgorgement if you can't cut through on the improper erosion? No, you can't, or at least no, you should not. If appellant's position is right on, let's call it for now, the Costco issue, the improper erosion issue, that there is no such theory, then you never get to the disgorgement issue. So while there are a number of factual disputes as to whether there may or may not have been a disgorgement, and we do disagree with the district judge, you never reach that issue if AXIS's improper erosion theory is wrong or unsupported by the law. So if the improper erosion is wrong, and I'm just talking hypothetically because we're not finding any of that at this point, but if the panel were to believe that the judge was wrong on improper erosion, can the inquiry end there, or does it have to go on to the disgorgement? It could end there as a matter of law. If the courts are not in a position to second-guess the decision of Northrop's underlying insurers, then that properly should end the case. AXIS's claim for recoupment fails. Just so that I understand the context, too, and then I'll let you go back to it. I'm sorry, I've been struggling with all of the context of all of this. You do not have a cross-motion for summary judgment, right? Correct. None was filed in the district court. So if, just hypothetically, if the court were to find that the district judge was wrong on the improper erosion and that AXIS could not attack the first level of insurance payment, then what would happen in the district court? Northrop would file a summary judgment motion, which presumably would win based on the Ninth Circuit's holding. So it would be a reversal. We have cross-motions for summary judgment, and then either one side is right or wrong, and so depending on how the court does it, then one side wins or loses right here, but that would not be the case here, right? Right. Because there were no cross-motions for summary judgment, the proper disposition by the court would be a reversal with a remand for further proceedings in accordance with the court's decision. And at that point, once it gets back to the district court, Northrop would file a summary judgment motion based on whatever statements of law this court would make. Okay, I'm sorry. You go back to your argument. You were going to address the erosion theory, and I do have a question. As you address it, maybe you could help me. So what do you understand to be the theoretical basis for the erosion theory? Is it contractual? Statutory? Or is there any legal basis for it? I don't think there is a legal basis, and I can explain both the case law and the contractual issue, but I don't see any support for Axis's theory under either. So as I understand from reading Axis's brief, that they point to the contractual language in their insurance policy. They point to one provision, but they overlook or skip over the provision that says the insurer may make any settlement of any claim it deems expedient with respect to any insured subject to such insured's written consent. That's at 482 of the excerpts of record. I think that's the critical provision of the insurance policy that essentially precludes any improper erosion theory based on the policy itself. If they were claiming there was some collusion or fraud involved, could they raise that claim? I think they could. Under the case law, there is an exception, at least in the situation where you're dealing with the same claim, if there's an allegation and if there's evidence of fraud or collusion. But there are no such allegations here. So when we say that these claims are not related, don't they sort of arise from the same factual kind of circumstance? Only in a very loose sense that they do involve ERISA and they do involve Northrop and they do involve the same policies, but they're different underlying claims in insurance parlance. Could you explain that? Because in the one case, you have originally the DOL settlement, which was a suit. It settled claims alleged by DOL arising out of one set of facts. And in the claim that's before this court, you have private plaintiffs and the settlement of those claims. So I have to say it's not totally unrelated, but it's a different claim. It's a different insurance claim. Let's put it that way. Well now, Mr. Fong, could excess carriers, I'm assuming that because here we've got two layers of them and access is the second layer, could they write policies that say that they have a right to contest any settlements under them? That they have to be with their consent? Could they write policies that would specify that? I think they probably could. That's not this policy, but they probably could creatively write a provision that gives them the right to second-guess each and every one of the settlements by the primary or the intermediate excess that exhausts or erodes the policy. Counsel, in this case, this is Judge Bumate, are you saying that this policy is ambiguous as to whether or not access can assert this erosion claim? Is it silent or does it actually preclude access from asserting this claim? I think fairly read it precludes, but even if it were ambiguous, we'd win as the policy holder under the principles of construction of an insurance policy that are summarized in the Costco case. But I really don't think it's ambiguous. When you read the provisions together, especially the provision that says the underlying insurer may make any settlement of any claim it deems expedient, I think that precludes access's improper erosion theory. And if we were to use, if we were to hold it as ambiguous, do you view the Costco law as, is that a candidate of contractual interpretation or is it some sort of background rule? The significance of Costco is that it does survey the cases from various jurisdictions, various circumstances, various provisions, and it accurately says that the weight of authority is that there is no basis for an excess insurer to second-guess the decisions of the underlying insurers that may have led to erosion or exhaustion. But it then goes on to look at the policies at issue. And I think that's the analysis this court should follow. It can survey the case law. It can follow or look to the analysis and reasoning of Costco. But then you should look to the policy language at issue here. And as Judge Callahan pointed out, there is nothing in the policy language here indicating that access, the excess insurer can second-guess the decisions of the underlying insurers. Imagine, you know, how impractical such a rule would be. And this may be why excess insurers don't write it into their policies. Imagine you have a products liability policy, a primary and one or more excess policies. You could have dozens or hundreds of underlying claims that are settled by the primary that lead to exhaustion or erosion. Under access's theory, they could challenge and the courts would have to resolve each and every one of those underlying claims that led to the exhaustion or erosion. That doesn't make a lot of sense, and I'm not sure there are many excess carriers that would want to write their policies in a way that get the courts entangled in that. They could write it that way, but they haven't in this case. Let me at this point pause, and unless the court has questions, I'll reserve my remaining time for Roberto. Okay. Thank you. If I may please the court, this is Tim West for Access Reinsurance Company. If I may, let me start out by explaining the real circumstances here and how access was harmed. These claims were treated by the DOL claim and the GRABEC claim were treated by National Union, CNA, the first excess carrier, Access, the second excess carrier, and Arch, the third excess carrier, as well as Northrop under the 2006 Northrop Arisa policy. So they were deemed by all the participants, all the participants deemed the DOL claim and the GRABEC claim to be treated under the same policy. So what happened? A portion of the National Union 2006 primary policy had previously been eroded. So Access exhausted the remainder of its $15 million primary limit when it funded the Department of Labor settlement. Then we had CNA's up to bat. CNA then exhausted its remaining limit in the amount of $7,043,000. CNA then, of course, CNA steps up and funds a portion of the GRABEC settlement in the amount of $7,043,762.88. But Mr. West, you're not challenging the GRABEC settlement, right? No, we're not challenging the GRABEC settlement as such, that's correct. But when Access, Access's position is that when it contributed the $9.7 million to the GRABEC settlement, that it was harmed because it contributed more to the GRABEC settlement than it otherwise would have contributed to the GRABEC settlement. And that amount is the amount of the Department of Labor settlement because the Department of Labor settlement is not covered as a matter of California public policy. Counsel, so what basis are you asserting your improper erosion claim? Is it based off a contract or based off a law? What's the basis of it? Well, it's both. It's clearly, it's based on California public policy as well as the terms of the insurance policy. Okay, start with insurance policy. How is it in the insurance policy? Well, first, if you look at the Access, Access policy expressly provides in what we would call the attachment provisions, I think this is ER 104 and 113, the insurance afforded under this policy shall apply only after the underlying insurers and or the insurance of the policyholder shall have paid the full amount of the underlying limits for covered loss under the underlying insurance. So it requires, before the Access policy attaches, it requires that the underlying insurers pay the full amount of their underlying limits for covered loss. Now what's interesting, let's go back to the CNA policy. The CNA policy actually has similar language. It says, only in the event of exhaustion of the limits of the underlying insurance by reason of the underlying insurance carriers and or the insurance, paying in legal currency loss, which, except for the amount thereof, would have been covered thereunder. So we have two Access policies in this case requiring that the underlying limits be paid only toward covered loss. Counsel, you would concede, though, that this provision is not explicit in saying that you can challenge National Union's determination of an unrelated claim or a prior claim. You would concede that, right? The provision is silent on the ability to challenge. I would concede that. Then why don't you lose? Because if it's silent on it, that you wrote the policy, so why doesn't the insured win then? Well, because this case is completely different than the Costco case. Access has never challenged any payment decisions made by the underlying carriers pertaining to the payment of defense expenses. That's never been done. And the policy wording that I just cited is completely different than the Access policy language in Costco. But the main thing is, in our case, it's not just a question that the claim isn't covered, the DOL settlement's not covered under the terms of the Access policy. It's not covered at all. It's not covered under the National Union primary policy. It's not covered under the CNA policy. It's not covered at all as a matter of California public policy. But wait a second on that, Mr. West. If you look at the California public policy, the statute that barred coverage in Bank of the West was, I think, Cal Insurance Code 533.5. It applies only to civil actions brought by the state AG, the district attorney, or a city prosecutor, not to actions like this one brought by the federal government, correct? Well, actually, the fact that it's brought by a regulator makes it a classic case of disgorgement. And the fundamental principle underlying Bank of the West, it's stated in Bank of the West and it's stated in Unified Western Grocers and subsequent cases that you cannot obtain insurance coverage for matters you've received which constitutes an ill-gotten gain or benefit. That is clear. California law is clear on that point. Bank of the West is clear on that point. And Bank of the West says it's well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Well, but in here where you have a settlement with the Department of Labor, and I know some of the allegations that the Department of Labor made, it used the words disgorgement, but they also used the words lost opportunities. When you have a settlement and there's no admission of guilt, how can we take from that that that per se is disgorgement? Well, first, a lot of cases involve settlements without admissions of guilt. There are uninsurable loss cases that involve settlement. You don't need an admission in this case because you can trace it from beginning to end. The DLO's, one of their original letters, I think dated February 2, speaks in terms of the seeking reimbursement of planned expenses which Northrop unlawfully obtained. And from beginning to end, they talk about restore. At the end, the settlement agreement says the remedy is to restore. And there's an extensive letter we cited which mentions disgorgement five times and it mentions excessive fees six times. The lost opportunity is the lost opportunity because of the funds that Northrop received that it shouldn't have received. But the remedy is exclusively disgorgement. And as I was mentioning, in Unified Western, although the concept of restitution may have a broader meaning in other contexts, we limit our references to adhere to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired. So you don't need an adjudication. All that you need is the ability to establish that the settlement agreement was for disgorgement and Judge Barak correctly held that it is. The linkage is clear. But wait, let me ask you this, Mr. West. Do you even get to the disgorgement? If hypothetically the court were to hold that you cannot, as the contract says here, the way that this is written, that you cannot under this policy attack the first policy, that you can't attack that, then do you even get to the disgorgement? Is that the end of the story? No, because it doesn't matter. There's never a provision in these excess policies that says you can attack. And we're not trying to get money back from National Union or CNA. We're not challenging their position. Our position is because they funded a settlement, which is clearly not covered under California law, that it harmed access. Once again, we're not relying on it. But hypothetically, you say your policy is silent to that. Why should the insured entity, as opposed to the insurer, bear the risk that an excess carrier might agree with the underlying insurer's payment? Because in this situation, we're not talking about questioning an underlying carrier's discretionary analysis of coverage based on policy terms or exclusions. We're talking here about a matter of California public policy. And California public policy holds, and Judge Barat recognized, that it wasn't covered. This payment was not covered under the National Union policy. It wouldn't have been covered under the CNA policy. It's not covered under any policy as a matter of California public policy because Bank of the West. Mr. West, this is Judge Paez. So let me ask you this. You know, it's not been my experience over the years that insurance companies voluntarily, generously make payouts, right? It's so obvious to you that this is contrary to California public policy, yet the primary insurer and the first excess insurer determined that these losses were coverable. Well, I mean, you don't claim that they acted fraudulently or colluded in some improper manners, I understand it. Why should we question what they've decided? Well, Your Honor, there's no indication that they considered it covered. And in fact, National Union… Then why did they make a payout of a substantial amount of money? Well, I could only speculate, but my speculation is because the Greybeck claim was still pending, and they may well have known they were going to be toast, as we say, down the road in settling Greybeck. So they went ahead and just offered up their limit on an uncovered claim, which resulted in a windfall to Northrop and harm to access. The… Justice Kellyanne asked the question… Then why is your claim not against the underlying insurance, not Northrop? Because the underlying carriers had exhausted or were exhausting their limits anyway by means of proper payments. They would have been exhausted… But you're asserting that their determination was the unlawful determination, so why isn't your claim against them? Because there would have been nothing to go after because the underlying limits would have been properly exhausted by proper payments. They would have been… The problem is… The problem is Access ended up contributing $5 million more towards the Greybeck settlement because of the erosion of the underlying limits by the payment of the DOL settlement. Can I just answer another question quickly? Sure. The reason is any other result creates a windfall in favor of Northrop in contravention of California public policy. If Northrop is entitled to keep all the money for the settlement, then Northrop, in fact, is restoring nothing. And this is an overarching factor. It's not at issue in any of the other erosion cases we cited. If this case is completely different than Costco, it's different than the underlying other cases on erosion because it implicates a matter of public policy. And any other result results in harm to Access and results in the windfall and unjust enrichment of Northrop. It's significantly different. Anything else, counsel? Mr. West? No, Your Honor. Okay. I don't think there are any other questions, so thank you. We'll hear from… I believe there's a little bit of time for rebuttal. Thank you. National Union and CNA could decide to settle for a variety of reasons. For example, to avoid future defense costs or eliminate risk of loss, including risk of loss to themselves, to Northrop, or to Access itself. Or Access or the courts to second-guess that decision would deprive the insured of its reasonable expectation that it can seek coverage from Access without having to justify the prior decisions of its underlying insurers that exhausted those underlying policies. That's the point made in the Costco case, and my apologies. I don't think I ever did get to Costco. But the Costco court did look to the Access policy language, which said that the Access policy attaches after the full amount of the underlying limits are paid, similar to this case. So does the rule in Costco apply here? Should we adopt that rule as law in this circuit? I think so, because in Costco and in the circumstances of our case, a reasonable insured would not understand that it would have to justify the underlying insurer's payment decisions, each and every one of those payment decisions, as a prerequisite of getting coverage from the Access insurer. I think that's the proper interpretation of the policy language here and in Costco. And Counsel, just to be clear, do you believe that Costco is a canon of contractual interpretation, or is it just a separate freestanding rule? Oh, I think ultimately the holding in Costco is a reading interpretation of the policy language in that case, with policy language similar to our case. But in our case, it's even better, because we have the expedient provision. Anything else, Counsel? I think my time is up. Thank you, Your Honors. Okay. Thank you very much, Counsel, for your argument and your willingness to participate remotely under these circumstances. Thank you very much. Thank you.
judges: Paez, Callahan, Bumatay